# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

DIAMEDICA THERAPEUTICS, INC.

        Plaintiff,

    v.

PRA HEALTH SCIENCES, INC. and
PHARMACEUTICAL RESEARCH
ASSOCIATES GROUP B.V.

        Defendants.

C.A. No.

**JURY TRIAL DEMAND**

## COMPLAINT

Plaintiff DiaMedica Therapeutics, Inc. ("DiaMedica" or "Plaintiff"), by and through its attorneys, files this Complaint against PRA Health Sciences, Inc. ("PRA USA") and Pharmaceutical Research Associates Group B.V. ("PRA Netherlands") (collectively, "PRA" or "Defendants"), and alleges as follows:

## THE PARTIES

1.    DiaMedica is a corporation organized under the laws of Canada with its principal place of business at 2 Carlson Parkway, Suite 260, Minneapolis, Minnesota 55447.

2.    PRA USA is a corporation organized under the laws of the State of Delaware with its principal place of business at 4130 ParkLake Avenue, Suite 400, Raleigh, NC 27612.

3.    PRA Netherlands is a corporation organized under the laws of the Netherlands with its principal place of business at Stationsweg 163, 9471 GP Zuidlaren, The Netherlands.

## JURISDICTION AND VENUE

4.    This is an action for, *inter alia*, breach of contract between a Minnesota resident corporation and Defendant, PRA USA, which is a Delaware resident (insofar as it is a Delaware

corporation) and its wholly-owned subsidiary, which as alleged herein is little more than an alter-ego of PRA USA. Accordingly, this Court has general personal jurisdiction over Defendants. In addition, and as alleged herein, agents of Defendants intentionally made material misrepresentations of fact to DiaMedica both before and after the execution of the principal agreement at issue and before and after the execution of the amendment of said contract, with the express intent of inducing DiaMedica (1) to rely on those statements, which DiaMedica reasonably did, (2) to execute both the principal agreement and the amendment thereto, and (3) to significantly expand the work performed by PRA Netherlands based on misrepresentations made.

5.     Subject matter jurisdiction in this district is proper under 28 U.S.C. § 1332(a)(2) because the amount in controversy is greater than $75,000 and because DiaMedica is a citizen of the State of Minnesota, and Defendants are, respectively, a resident of Delaware and/or North Carolina and a resident of a foreign state.

6.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1) and under 28 U.S.C. § 1391(c)(2), as to PRA USA, and § 1391(c)(3), as to PRA Netherlands.

## BACKGROUND

7.     DiaMedica is a clinical-stage biopharmaceutical company that develops innovative treatments where there is significant unmet clinical need or where no current therapies are available.

8.     DiaMedica is currently developing DM199, a recombinant (synthetic) human protein for patients suffering from neurological and kidney diseases including chronic kidney disease ("CKD") and acute ischemic stroke ("AIS"). There are currently no FDA-approved therapeutic treatments for CKD, and the only FDA-approved treatment for AIS must be administered within three to four hours after a stroke.

2

9. DM199 offers a novel approach for the treatment of CKD, a widespread health problem that affects more than 30 million Americans. Primary causes of CKD include diabetes (Type 1 and Type 2) and hypertension. More than 40% of all diabetics will develop CKD. Currently, there is no cure for CKD. Even with treatment to manage the disease, approximately 20% of CKD patents will progress to end-stage renal disease.

10. As part of its development efforts, DiaMedica has contracted with various companies to manage clinical trials on its behalf. DM199 has undergone multiple clinical trials designed primarily to establish the safety and tolerability of DM199 and characterize the pharmacokinetics after subcutaneous and intravenous dosing.

11. At the time that DiaMedica engaged Defendants, however, DM199 had undergone limited development work and, as a result, the clinical trials conducted by Defendants were critical to DiaMedica's operations.

12. PRA USA is a Delaware corporation with its global headquarters located in Raleigh, North Carolina. PRA USA advertises itself as "one of the world's leading global Contract Research Organizations (CROs), providing outsourced clinical development services to the biotechnology and pharmaceutical industries." *See* PRA Health Sciences 2016 Sustainability Report, located on the web at https://assets.ctfassets.net/iwx4yke9yw3a/2IX7UJa6aIuO6i4KeISemw/c34f857b34104488a95488881312298b/PRA_2016_Sustainability_Report.pdf.

13. According to PRA USA, it employs over 15,000 employees and operates in more than eighty (80) countries, including, *inter alia*, the United States, where it has multiple locations, including, without limitation, in the states of North Carolina, Kansas, New Jersey, Pennsylvania, Utah, and Virginia. *See* "About PRA", available online at https://prahs.com/about-pra/.

14.     PRA USA further distinguishes itself from its competition by stressing that its global reach gives it the ability to conduct clinical studies with wide-ranging scope, from single-site studies all the way up through multi-state global studies, which allows its clients to test their products in a wide range of circumstances on populations around the world.  *See* PRA Health Sciences, Inc. Form 10-K for fiscal year ended December 31, 2017, available online at https://www.sec.gov/edgar.shtml.

15.     Moreover, PRA USA claims to provide, and upon information and belief does in fact provide, centralized project management services to its various locations around the world through a common electronic and information management infrastructure that allows employees from any of its worldwide locations to "create, collect, store, edit and retrieve any electronic document" from any of PRA USA's other "office locations worldwide…." *Id.*

16.     Consistent with its published materials, PRA USA marketed itself to DiaMedica as a CRO with a global reach and dozens of "locations" or "sites" around the world.

17.     PRA Netherlands, a Dutch company and wholly owned subsidiary of PRA USA, is just one of those "locations" or "sites."

18.     In or about the second half of 2011, PRA USA approached DiaMedica in Minnesota, inquired into DiaMedica's clinical trial needs and solicited DiaMedica to hire PRA USA to perform clinical trials on DiaMedica's behalf.

19.     DiaMedica's Chief Executive Officer ("CEO"), Rick Pauls ("Pauls"), and Vice President of Research, Dr. Mark Williams ("Williams"), agreed to speak with PRA USA, with the first such meeting taking place telephonically on or about November 9, 2011 with DiaMedica's representatives in Minnesota.

20.     Although DiaMedica did not affirmatively decide to engage PRA USA at that time, the parties continued their discussions, leading to a May 15, 2012 request directed to Williams in Minnesota by Ken Monger ("Monger"), a PRA USA employee from Virginia, for DiaMedica to meet with "Andre van Vliet, PRA's Vice President of Medical Affairs" ("van Vliet") at the American Diabetes Association's American Diabetes Conference on June 8, 2012 in Philadelphia, Pennsylvania.

21.     After not receiving a response, Monger directed an identical request to Williams in Minnesota on May 30, 2012.

22.     On or about June 8, 2012, Pauls and Williams met with van Vliet, PRA's Vice President of Medical Affairs, at the American Diabetes Conference in Philadelphia to discuss a possible Phase I/II clinical study involving DM199.

23.     During that June 8, 2012 meeting, van Vliet made multiple representations to Pauls and Williams regarding PRA's and van Vliet's extensive prior success with Phase I/II clinical trials at PRA's site in the Netherlands. Specifically, van Vliet represented that their extensive prior success was directly related to the highly predictable clinical performance of patients enrolled in the placebo control group that he (and PRA) would implement for DiaMedica affirming that this study design "works like clockwork" to determine whether the drug being tested is active.

24.     Also in June 2012, van Vliet invited Pauls and Williams to PRA's office in the Netherlands to discuss the potential to work together and the potential for PRA to perform a clinical trial on DM199.

25.     PRA USA continued to press DiaMedica and encouraged it to engage PRA USA to perform a clinical trial for DiaMedica at one of its sites, suggesting either a facility located in Kansas or its Netherlands facility.  PRA USA represented that the Netherlands facility was

uniquely positioned to complete the trial in a shorter time period than its United States-based locations and, as a result, could complete the trial in a more cost-effective manner.

26.     To be clear, PRA USA's employees and agents directed and controlled all negotiations between DiaMedica and Defendants and were solely responsible for encouraging DiaMedica to allow Defendants to conduct any clinical trial that Defendants might perform at what DiaMedica understood to be PRA USA's Netherlands facility.

27.     The parties' discussions continued throughout 2012, leading to additional teleconferences initiated by PRA USA's representatives with DiaMedica's representatives in Minnesota, including an October 1, 2012 call initiated by Lisa Sanford ("Sanford"), who PRA USA has confirmed was an account director employed by PRA USA.

28.     At or about that time, at PRA USA's urging, DiaMedica agreed to visit what DiaMedica understood was PRA USA's location in the Netherlands in November 2012.

29.     In advance of that meeting, on November 10, 2012, Sanford, on behalf of PRA USA, provided Williams with a PowerPoint presentation regarding the clinical trial design proposed by PRA USA that would be conducted by its Netherlands facility if DiaMedica decided to engage PRA USA's services.

30.     On or about November 12, 2012, Pauls and Williams met with van Vliet at PRA's offices in the Netherlands. At no time did van Vliet or any other representative or agent of PRA USA or PRA Netherlands state or otherwise indicate that PRA Netherlands was anything other than one of PRA USA's many global locations. As far as DiaMedica was aware, based upon all statements made by van Vliet and PRA USA's and/or PRA Netherlands' agents, DiaMedica was dealing at all times with PRA Health Sciences, Inc., a multinational public corporation, which all such agents referred to as "PRA."

31.     During that meeting, van Vliet made multiple representations to the DiaMedica representatives, including but not limited to, again stating that the PRA sequestered patient clinical study design worked like "clockwork" where fasting blood glucose always remained stable or increased in control group patients (patients receiving placebo) and only decreased in patients receiving the study drug if the tested study drug was active.

32.     van Vliet further provided written examples for DiaMedica and represented that this study design at PRA had always been successful when used, indicating success at a per patient level with at least 30 such studies in the past.

33.     At the time van Vliet made the statements referenced herein to Pauls and Williams, he knew that many other factors other than an active agent could influence blood-glucose levels, yet he intentionally and/or negligently omitted those factors from his statements to DiaMedica. Instead, van Vliet represented to DiaMedica that PRA's study methodology was designed to ensure, and had repeatedly demonstrated, the consistent performance of control group patients.

34.     On November 12, 2012 at PRA's Netherlands offices, van Vliet made those statements and omitted the aforesaid material facts regarding the impact of other factors specifically to induce DiaMedica to enter an agreement with PRA.

35.     That same day van Vliet emailed, *inter alia*, Pauls, Williams, and Sanford providing them with a copy of the PowerPoint presentation used during the meeting, along with handwritten notes, which he adapted based upon the comments in the meeting to further assure Pauls and Williams that PRA's study design worked as stated.

36.     Subsequently, on November 16, 2012, Sanford directed an email to Williams and Pauls in Minnesota, thanking them for meeting with PRA in the Netherlands and stating that she

was "happy to facilitate any required next steps," and asking them to let her know how DiaMedica wished to proceed.

37.     Sanford next reached out to DiaMedica on December 7, 2012, forwarding an updated proposal that was reflective of using the "PRA's study design" proposed by van Vliet, stating that one of the testing parameters desired by DiaMedica "is also available at the N[etherlands] lab" and that she, on behalf of PRA USA, was "happy to provide what makes the most sense [DiaMedica's preferred test parameters] and what works best for you [DiaMedica] currently."

38.     Following a subsequent teleconference, on December 21, 2012, Sanford emailed Pauls, Williams, and Mark Robbins ("Robbins"), DiaMedica's Vice President of Clinical and Regulatory Affairs, stating that she would "assist with all contractual matters."

39.     The parties continued to engage in negotiations throughout December 2012 and into the beginning of January 2013.   At all times, PRA USA and PRA Netherlands were represented in those negotiations by Sanford, an employee of PRA USA, who negotiated on behalf of PRA – again, never indicating that PRA Netherlands was a separate entity and never indicating to DiaMedica that PRA Netherlands, as a separate entity, could negotiate separately from PRA USA.

40.     At all times during those negotiations, which were initiated by PRA USA, PRA USA's employees and agents intentionally directed telephonic and electronic communications to DiaMedica in Minnesota on behalf of Defendants for the specific purpose of entering into a long-term clinical trial studies agreement with DiaMedica.

41.     On January 18, 2013, in reliance upon the representations van Vliet had made to DiaMedica's representatives, DiaMedica (then known as DiaMedica Inc.) signed a Letter of Intent

for Clinical Trial and Laboratory Services (the "LOI"), which authorized PRA to begin work on the clinical trial. DiaMedica understood that van Vliet would have a lead role in the design and management of the clinical trial.

42. From that time through March 18, 2013, the parties continued to engage in contractual negotiations whereby DiaMedica would engage PRA to perform a clinical trial regarding DM199 at its Netherlands facility. At all times, PRA was represented in those negotiations by Sanford and Martin Postema, another employee of PRA USA, who both intentionally and knowing directed communications to DiaMedica's employees in Minnesota, engaged in negotiations with DiaMedica's employees in Minnesota, and sent drafts and revisions to and accepted drafts and revisions from DiaMedica's employees in Minnesota, all for the purpose of entering into a long-term contract with DiaMedica, a Minnesota resident.

43. Also during the course of those negotiations, Sanford, on behalf of Defendants, visited DiaMedica in Minnesota on February 12, 2013, along with David Watkins, another PRA USA employee, in furtherance of Defendants' contract negotiations with DiaMedica.

44. On or about March 18, 2013, in reliance upon the representations van Vliet had made to DiaMedica's representatives regarding, *inter alia*, the prior success of the clinical trials, DiaMedica and PRA signed an Agreement for Clinical Trials Management Services (the "Agreement").

45. Pursuant to the Agreement, PRA agreed to manage a DM199 clinical trial for a study titled, "A Double-Blinded, Placebo-Controlled, Single-Dose and Multiple-Dose Study to Evaluate the Safety, Tolerability, Pharmacokinetics, Pharmacodynamics and Proof of Concept of DM199 in Healthy Subjects and Patients with Type 2 Diabetes Mellitus" (the "Study").

46.     The Agreement included detailed "Project Specifications" that identified the objectives, protocols, patient criteria, and other requirements for the Study. Among other requirements, the Agreement specified age and Body Mass Index ("BMI") ranges for various categories of participants, as well as the required dosage of DM199 for certain participants as a function of their weight.

47.     PRA agreed to conduct the Study in accordance with the Project Specifications, Good Laboratory Practices ("GLP"), International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use ("ICH"), and other applicable regulations of the FDA, the European Medicines Agency ("EMA"), and other regulatory authorities.

48.     The Study began in April 2013.  PRA conducted the Study at a clinical test facility in the Netherlands owned and operated by PRA. DiaMedica issued a press release announcing the commencement of the Study on May 1, 2013.

49.     In addition, on December 18, 2013, Sanford visited with DiaMedica the purpose of discussing the work PRA was or could be performing on behalf of DiaMedica.

50.     van Vliet was DiaMedica's primary point of contact during the Study. In February and March 2014, van Vliet informed DiaMedica in writing that he saw convincing evidence of efficacy in certain Study participants and which indicated that DM199, rather than placebo, was responsible for extremely positive results that "cannot be else than efficacy based on an active compound".

51.     In reliance on those representations, DiaMedica made business decisions, including the rejection of an offer from a major pharmaceutical company for exclusive licensing rights to DM199, because positive Study results like those reported by van Vliet would substantially

increase the value of both DM199 and DiaMedica. As a result, DiaMedica lost, *inter alia*, (1) an upfront, non-dilutive technology license payment of over $12 million; (2) additional direct milestone payments and royalties on future sales; and (3) reimbursement of all costs associated with the development, production, and marketing of DM199 from one of the largest pharmaceutical companies in the world that could have created significant additional value for DiaMedica.

52.     On June 15, 2014, DiaMedica's senior management met with van Vliet during the American Diabetes Conference in Chicago. At that meeting, van Vliet updated his previous reports and informed DiaMedica that at least eight Study participants treated with DM199 had lost a clinically very significant amount of weight over the course of the Study of 9+ kilograms. van Vliet later confirmed this information in writing.

53.     van Vliet knew or had reason to know that those representations were false, yet he made them to DiaMedica with the express intent of soliciting additional study work from DiaMedica to be conducted by PRA based solely on the extremely positive data he was seeing even though the Study was double blinded and such communications violated the blinding requirements of the Study.

54.     van Vliet further knew that DiaMedica had no choice but to rely on his statements due to the blinded nature of the Study because DiaMedica did not have access to the underlying data during the course of the Study.

55.     Further, van Vliet's decision to unilaterally reveal that information to DiaMedica constituted a breach of the parties' agreement because it broke the Study's blinding.

56.     In addition, on November 5, 2014, based on van Vliet's reports of clinically significant weight loss and the expectation that DiaMedica would receive a preliminary clinical

study report indicating very positive Study results by mid-November, DiaMedica announced that it was cancelling a previously announced public offering of up to 24 million shares.

57.     On November 14, 2014, PRA sent DiaMedica preliminary results of the Study (the "Results").

58.     The Results showed that the Study demonstrated that DM199 was safe and well tolerated by patients.  However, contrary to van Vliet's representations to DiaMedica during the conduct of the Study, the Results did not indicate a clinically significant improvement in glucose or weight loss, compared to placebo as van Vliet had repeatedly communicated to DiaMedica, both verbally and in writing.

59.     In fact, PRA's preliminary results indicated that participants given the placebo, in some circumstances, not only reacted as if given DM199, but also as if they were cured of their condition, an outcome that van Vliet represented on multiple occasions, as discussed *supra*, *had not previously occurred* and could not occur under the study methodology proposed by PRA.

60.     The Results also failed to document the very significant weight loss in numerous Study participants previously reported by van Vliet (details of which PRA has and continues to refuse to provide to DiaMedica).

61.     On November 17, 2014, DiaMedica issued a press release summarizing the Results. DiaMedica's stock price immediately collapsed, losing more than $35 million in corporate value.

62.     The drastic decline in the value of DiaMedica resulted in prolonged financial difficulty for the company and an inability to obtain new investments or financing, financial difficulty that was further compounded by the fact that DiaMedica had rejected over $12 million in funding, additional direct milestone payments and sales royalties and reimbursement of all costs

associated with the development, production, and marketing costs based upon van Vliet's earlier representations regarding what PRA was finding during the course of the Study.

63. In late 2014, DiaMedica no longer had sufficient funds to pay PRA amounts owed under the Agreement. PRA responded by stopping additional work and withholding Study records, documentation and draft reports. As a result, PRA and DiaMedica agreed to a payment plan that provided for DiaMedica to pay additional interest on deferred payments. Despite agreeing to these additional terms and insisting on receiving increased payments from DiaMedica, PRA did not fulfill its own obligations under the parties' Agreement and, in fact, had not fulfilled its obligations up through the date that it agreed to those new terms, unbeknownst to DiaMedica.

64. In 2015 and 2016, DiaMedica secured additional capital investment in order to pay PRA past-due amounts owed, including interest, per the terms of a payment plan agreed to by PRA and DiaMedica.

65. DiaMedica has paid PRA, in total, in excess of $2.5 million.

66. In late 2016, PRA released a draft Clinical Study Report (the "Report") for DiaMedica's review.

67. After receiving the Report, DiaMedica learned that PRA failed to comply with the Project Specifications and the study protocol set forth in the Agreement and with generally accepted standards for conducting similar clinical trials.

68. For example, PRA mishandled blood samples taken from Study participants. Blood samples were switched and incorrectly labelled, as was documented in PRA's notes to file.

69. PRA processed blood samples incorrectly and did not repeat them.

70. PRA administered incorrect dosing to at least one patient.

13

71.     PRA failed to provide records of Study participants' body weights during the dosing phase of the Study.

72.     PRA included at least two subjects in the Study who did not meet the inclusion criteria specified in the Agreement.

73.     PRA insufficiently documented the role of all physicians in the Study, including van Vliet.

74.     On information and belief, PRA's errors resulted from the negligence or recklessness of PRA and its employees, independent contractors, or agents.

75.     On information and belief, PRA's negligence or recklessness compromised the accuracy of the Study results.

76.     After receiving the Report, DiaMedica exchanged emails with PRA over the course of several months in an attempt to obtain additional information, including study records for which DiaMedica had paid and owned per the terms of the Agreement, concerning the Study and to clarify discrepancies between the Report and information provided by van Vliet.

77.     DiaMedica repeatedly requested additional data, records, and other Study-related documents and information from PRA.

78.     On September 5, 2017, DiaMedica sent a letter to David Dockhorn, Executive Vice President and Corporate Compliance Officer for PRA Health Sciences, PRA's parent company, to formally notify PRA of a dispute between the parties and to request PRA's cooperation in resolving the dispute. In that letter, DiaMedica specifically requested data generated by PRA during the course of the Study and other documentation related to the Study.

79.     Pursuant to the Agreement, all data generated by PRA during the course of the Study is DiaMedica's property and PRA agreed to provide all such data to DiaMedica at its request.

80.     Pursuant to the Agreement, PRA agreed to allow DiaMedica representatives to inspect Study documentation and any other information necessary for DiaMedica to confirm that PRA performed the Study in conformance with standard operating procedures, the Agreement, and applicable laws and regulations. PRA also agreed to provide copies of any materials reasonably requested by DiaMedica during an inspection.

81.     Pursuant to the Agreement, PRA was required to make available all relevant records, programs, and data that DiaMedica may request for purposes related to filing and prosecution of new drug applications or other regulatory submissions.

82.     PRA repeatedly refused to provide Study-related data, records, and documentation requested by DiaMedica that has already been paid by DiaMedica. The repeated refusals by PRA to provide these documents have delayed DiaMedica's ability to move its product forward and resulted in approximately two years lost patent life which is a critical asset for DiaMedica.

### FIRST CAUSE OF ACTION
**DiaMedica v. Defendants**
(Breach of Contract)

83.     DiaMedica re-alleges and incorporates by reference paragraphs 1 through 82 of this Complaint as if fully set forth herein.

84.     Between October 2012 and March 2013, DiaMedica engaged in contract negotiations with PRA USA, which ultimately resulted in the negotiation, drafting, and execution of the Agreement between DiaMedica and PRA Netherlands on or about March 18, 2013.

85.     Although a non-signatory to the Agreement, PRA USA exercised complete domination and control over PRA Netherlands, which did not separately engage in contract negotiations with DiaMedica or otherwise represent that it was capable of doing so.

86.     As alleged above, at all times relevant hereto, PRA USA, through its agents, employees, including, without limitation, Sanford and Watkins, represented to DiaMedica that

PRA Netherlands was nothing more than PRA USA's Netherlands location, facility, site, or laboratory.

87.     At all times during the parties' negotiations, PRA USA encouraged DiaMedica to allow it to perform the DM199 clinical trial in its Netherlands facility, PRA Netherlands, and represented to DiaMedica that it would be both more time and cost effective to conduct the study at that PRA USA location than at PRA USA's other facilities, including a facility in Kansas, which the parties specifically discussed during their negotiations.

88.     Accordingly, although technically a non-signatory to the Agreement, PRA USA exercised such pervasive domination and control over PRA Netherlands that it should be bound by the terms of the Agreement between DiaMedica and PRA Netherlands and held liable for PRA Netherlands' breaches thereof.

89.     DiaMedica performed all, or substantially all, of its obligations under the Agreement.

90.     Under the Agreement, PRA committed to conduct the Study in accordance with the Project Specifications set forth in the Agreement and with generally accepted standards for conducting similar clinical trials, including GLP and ICH standards and all applicable FDA and EMA regulations.

91.     PRA also committed to provide or permit inspection of, at DiaMedica's request, all data, records, and documentation generated during or otherwise related to the Study.

92.     PRA materially breached the Agreement by failing to conduct the Study in accordance with the Project Specifications set forth in the Agreement and with generally accepted standards for conducting similar clinical trials, and by breaking the Study's blinding by reporting results prior to the Study's completion.

93.     PRA also materially breached the Agreement by refusing to provide or permit inspection of Study-related data, records, and documentation requested by DiaMedica.

94.     DiaMedica incurred damages in excess of $75,000.00 as a result of PRA's breaches and/or as a result of PRA Netherlands' and PRA USA's respective breaches, including damages resulting from the negligence or recklessness of PRA and its employees, independent contractors, or agents, including, without limitation, moneys paid to PRA under the Agreement and moneys paid to PRA for work performed outside the scope of the Agreement including approximately (1) $3 million paid to PRA, (2) $4 million to re-run study today, (3) $35 million in lost corporate value, and (4) two years lost patent life by stonewalling DiaMedica's ability to move its business forward.

95.     As PRA Netherlands' alter ego, PRA USA is liable for the recovery sought by DiaMedica in this claim.

**SECOND CAUSE OF ACTION**
**DiaMedica v. Defendants**
(Breach of the Implied Covenant of Good Faith and Fair Dealing)

96.     DiaMedica re-alleges and incorporates by reference paragraphs 1 through 95 of this Complaint as if fully set forth herein.

97.     DiaMedica and PRA entered into the Agreement on or about March 18, 2013.

98.     DiaMedica performed all, or substantially all, of its obligations under the Agreement.

99.     PRA deliberately and unreasonably acted in a manner to deprive DiaMedica of the Records and Results of the study as stipulated in the Agreement and as promised by van Vliet, and withheld benefits from DiaMedica.

100. In February and March 2014, van Vliet informed DiaMedica in writing that he saw convincing efficacy in certain Study participants and that DM199, rather than placebo, was responsible for extremely positive results that could only be explained by an active drug.

101. In June 15, 2014, DiaMedica's senior management met with van Vliet during the American Diabetes Conference in Chicago. At that meeting, van Vliet informed DiaMedica that at least eight Study participants lost a clinically significant amount of weight (9+ kilograms) over the course of the Study. van Vliet later confirmed this information in writing.

102. Contrary to van Vliet's correspondence with DiaMedica, the Results did not indicate a clinically significant improvement in glucose control or weight loss as previously reported.

103. Despite DiaMedica having agreed to a payment plan with PRA and commencing payments to PRA, PRA refused to provide Study-related data, records, and documentation requested by DiaMedica.

104. DiaMedica incurred damages as a result of PRA's breaches.

105. As PRA Netherlands' alter ego, PRA USA is liable for the recovery sought by DiaMedica in this claim.

### THIRD CAUSE OF ACTION
### DiaMedica v. Defendants
(Fraud)

106. DiaMedica re-alleges and incorporates by reference paragraphs 1 through 105 of this Complaint as if fully set forth herein.

107. By reason of the aforesaid, Defendants, through their agent, van Vliet, fraudulently induced DiaMedica to enter into the Agreement and attempted to expand the scope of work performed by PRA by making the following misrepresentations to DiaMedica:

(a)    On June 8, 2012, van Vliet misrepresented to DiaMedica during a meeting in Philadelphia, Pennsylvania that his study methodology "worked like clockwork" and ensured the highly predictable clinical performance of patients enrolled in the placebo control group, he (and PRA) would implement for DiaMedica "works like clockwork" to determine whether the drug being tested is active.

(b)    On November 12, 2012, during his presentation to DiaMedica in the Netherlands and during prior and subsequent discussions, van Vliet repeatedly misrepresented the efficacy of his study methodology, which he, continually represented "worked like clockwork" and assured that the placebo control group could never react in such a way as to make it impossible to determine if the drug being tested was active in the Study's participants. van Vliet omitted from his statements his own knowledge that other factors could affect the Study's outcomes.

(c)    On December 21, 2012, during a teleconference between DiaMedica and PRA, which both Sanford and van Vliet knew DiaMedica participated in from Minnesota, van Vliet repeated the same misrepresentations and omitted from his statements his own knowledge that other factors could affect the Study's outcomes.

108.    van Vliet made those misrepresentations with the specific intent to induce DiaMedica to enter into the Agreement with PRA and with the expectation that DiaMedica would rely on those representations when deciding whether or not to engage PRA to perform the DM199 clinical trial.

109.    DiaMedica did in fact rely on those misrepresentations and omissions and, relying on those misrepresentations and omissions, entered into the Agreement.

110.    During the course of the Study, van Vliet, in violation of the Agreement and the standards governing study conduct, repeatedly misrepresented the data that PRA had obtained through the Study, including:

(a)    In February and March 2014, van Vliet misrepresented to DiaMedica in writing that he saw convincing efficacy in certain Study participants and that DM199, rather than placebo, was responsible for extremely positive results that could only be explained by an active drug.  Those written communications were directed to DiaMedica in Minnesota intentionally and knowingly by van Vliet and were not expected by DiaMedica.

(b)    On June 15, 2014, van Vliet misrepresented to DiaMedica that at least eight Study participants lost a clinically significant amount of weight over the course of the Study. van Vliet later confirmed this information in written communications that he intentionally and knowingly directed to DiaMedica in Minnesota.

111.    van Vliet made those misrepresentations with the specific intent that DiaMedica would rely on them and, *inter alia*, engage PRA to perform additional work on DiaMedica's behalf.

112.    DiaMedica did, in fact, reasonably rely on those misrepresentations made by van Vliet and, as a result of that reasonable reliance, *inter alia*, rejected a significant licensing agreement from a major pharmaceutical company, as discussed *supra* and in delaying raising capital from investors.

113.    van Vliet made those misrepresentations intentionally, willfully, wantonly, and maliciously and with the specific intent to benefit PRA to DiaMedica's detriment.

114.    At all times relevant hereto, van Vliet was employed by PRA USA and/or PRA Netherlands and was held out to DiaMedica by both himself and by other employees of PRA USA as a Vice President of PRA USA and, therefore, its agent.

115.    van Vliet performed each of those foregoing acts in his capacity as an employee and agent of both PRA USA and PRA Netherlands.

116.    As PRA Netherlands' alter ego, PRA USA is liable for the recovery sought by DiaMedica in this claim.

**FOURTH CAUSE OF ACTION**
**DiaMedica v. Defendants**
(Negligent Misrepresentation)

117.    DiaMedica re-alleges and incorporates by reference paragraphs 1 through 116 of this Complaint as if fully set forth herein.

118.    By reason of the aforesaid, Defendants, through their agent, van Vliet, induced DiaMedica to enter into the Agreement and attempted to expand the scope of work performed by PRA by negligently making the following misrepresentations to DiaMedica:

(a)    On June 8, 2012, van Vliet misrepresented to DiaMedica during a meeting in Philadelphia, Pennsylvania that his study methodology "worked like clockwork" and ensured the highly predictable clinical performance of patients enrolled in the placebo control group, he (and PRA) would implement for DiaMedica "works like clockwork" to determine whether the drug being tested is active.

(b)    On November 12, 2012, during his presentation to DiaMedica in the Netherlands and during prior and subsequent discussions, van Vliet repeatedly misrepresented the efficacy of his study methodology, which he, again, represented "worked like clockwork" and ensured that the placebo control group could never react in such a way as to make it impossible to determine if the drug being tested was active in the Study's participants. van Vliet omitted from his statements his own knowledge that other factors could affect the Study's outcomes.

(c)    On December 21, 2012, during a teleconference between DiaMedica and PRA, which both Sanford and van Vliet knew DiaMedica participated in from Minnesota, van

Vliet repeated the same misrepresentations and omitted from his statements his own knowledge that other factors could affect the Study's outcomes.

119.    van Vliet should have known that those misrepresentations would induce DiaMedica to enter into the Agreement with PRA and with the expectation that DiaMedica would rely on those representations when deciding whether or not to engage PRA to perform the DM199 clinical trial.

120.    DiaMedica did in fact rely on those misrepresentations and omissions and, relying on those misrepresentations and omissions, entered into the Agreement.

121.    During the course of the Study, van Vliet, in violation of the Agreement and standards for the conduct of clinical studies, repeatedly misrepresented the data that PRA had obtained through the Study, including:

(a)    In February and March 2014, van Vliet misrepresented to DiaMedica in writing that he saw convincing efficacy in certain Study participants and that DM199, rather than placebo, was responsible for extremely positive results that could only be explained by an active drug.   Those written communications were directed to DiaMedica in Minnesota intentionally and knowingly by van Vliet.

(b)    On June 15, 2014, van Vliet misrepresented to DiaMedica that at least eight Study participants lost a clinically significant amount of weight over the course of the Study. van Vliet later confirmed this information in written communications that he intentionally and knowingly directed to DiaMedica in Minnesota.

122.    van Vliet knew or should have known that DiaMedica would rely on those misrepresentations and omissions of fact and, *inter alia*, engage PRA to perform additional work on DiaMedica's behalf.

123.     DiaMedica did, in fact, reasonably rely on those misrepresentations made by van Vliet and, as a result of that reasonable reliance, *inter alia*, (1) rejected a significant licensing agreement from a major pharmaceutical manufacturer, as discussed *supra*.

124.     At all times relevant hereto, van Vliet was employed by PRA USA and/or PRA Netherlands and was held out to DiaMedica by both himself and by other employees of PRA USA as a Vice President of PRA USA and, therefore, its agent.

125.     van Vliet performed each of those foregoing acts in his capacity as an employee and agent of both PRA USA and PRA Netherlands.

126.     As PRA Netherlands' alter ego, PRA USA is liable for the recovery sought by DiaMedica in this claim.

**FIFTH CAUSE OF ACTION**
**DiaMedica v. Defendants**
(Equitable/Promissory Estoppel)

127.     DiaMedica re-alleges and incorporates by reference paragraphs 1 through 126 of this Complaint as if fully set forth herein.

128.     Alternatively, and to the extent that the finder of fact determines that a legally enforceable contract did not exist between DiaMedica and/or either or both of the Defendants, Defendants should be held liable to DiaMedica under the principles of equitable and/or promissory estoppel.

129.     As aforesaid, DiaMedica entered into an agreement with PRA USA, who dominated and controlled all negotiating, drafting, and revising of the Agreement with DiaMedica on behalf of both Defendants and who agreed to provide DiaMedica with the services described in the Agreement and the exhibits thereto and to perform all such services on DiaMedica's behalf at its Netherlands location.

130. DiaMedica reasonably relied on PRA USA's promises, including its promises to perform clinical trial services according to the terms of the Agreement, the exhibits, and the amendments thereto, and substantially changed its position in reliance on those promises by, *inter alia*, selecting PRA to perform the Phase I/II clinical trial on its flagship product, paying money to PRA in exchange for providing clinical trial services, and rejecting an exclusive licensing agreement in reliance upon van Vliet's representations.

131. Defendants failed to fulfill those promises and, as a result, DiaMedica was damaged.

132. Further, DiaMedica reasonably relied on PRA USA's representations that PRA Netherlands was simply one of PRA USA's facilities and that PRA USA, a well-known, publicly traded multi-national entity, was the true party to the Agreement along with DiaMedica, such that it would be unjust for PRA USA now to hide behind the corporate veil of an entity that it entirely dominates and controls, because, *inter alia*, PRA Netherlands did not engage in *any* of the parties' negotiations or discussions. To allow PRA USA to escape liability for the promises that it made and that DiaMedica reasonably relied on to its detriment as aforesaid would be inequitable.

133. Accordingly, DiaMedica demands judgment in its favor and against both PRA USA and PRA Netherlands under the theory of equitable and/or promissory estoppel.

134. As PRA Netherlands' alter ego, PRA USA is liable for the recovery sought by DiaMedica in this claim.

### SIXTH CAUSE OF ACTION
**DiaMedica v. Defendants**
(Action to Pierce the Corporate Veil)

135. DiaMedica re-alleges and incorporates by reference paragraphs 1 through 134 of this Complaint as if fully set forth herein.

136.    At all times relevant hereto, PRA USA is and has been a corporation formed and existing under the laws of the State of Delaware, while PRA Netherlands, its wholly owned subsidiary, is and has been a corporate entity formed and existing under the laws of the Netherlands.

137.    As alleged at length *supra*, at all times relevant hereto, PRA USA exercised complete control and domination over PRA Netherlands, particularly with respect to the negotiation, drafting, execution, and performance of the Agreement.

138.    Also as alleged *supra*, PRA USA represented to DiaMedica that PRA Netherlands was nothing more than a facility owned and operated by PRA USA.

139.    PRA USA actively encouraged DiaMedica to allow PRA USA to conduct its clinical trial at its PRA Netherlands facility, and did not permit or allow PRA Netherlands or its personnel to participate in, let alone guide, the parties' negotiations or interactions.

140.    At all times relevant hereto, the primary persons who acted as Defendants' agents in their dealings, including van Vliet, Sanford, Watkins, and Postema, were employed by PRA USA or represented themselves as being employed by PRA USA.

141.    As set forth *supra*, DiaMedica relied on those representations and believed itself at all times relevant hereto to be dealing with a reputable, publicly traded, American corporation.

142.    Because of DiaMedica's reliance on the representations made by PRA USA's representatives and agents and because PRA USA wholly dominates and controls PRA Netherlands, such that it is no more than an alter ego utilized for improper purposes by PRA USA, PRA USA should not be permitted to hide behind the fictitious corporate veil and should be held liable for PRA Netherlands' wrongful acts and omissions, which are described at length *supra*.

143. Injustice will result if the corporate form of PRA Netherlands is maintained and shields PRA USA for liability arising from the active and direct role it played in Defendants' relationship with DiaMedica.

### SEVENTH CAUSE OF ACTION
**DiaMedica v. Defendants**
(Alter Ego/Single Enterprise Liability)

144. DiaMedica re-alleges and incorporates by reference paragraphs 1 through 143 of this Complaint as if fully set forth herein.

145. At all times relevant hereto, PRA USA controlled and dominated its wholly-owned subsidiary, PRA Netherlands, causing PRA Netherlands to have no separate existence and to act as a mere instrumentality of PRA USA. The corporate structure owned, directed, and controlled by PRA USA was merely a façade masking a single enterprise acting in concert for the benefit of PRA USA.

146. In all of Defendants' dealings with DiaMedica, PRA USA exerted pervasive control over PRA Netherlands and disregarded corporate formalities. As alleged above, PRA USA and its representatives, employees, and agents completely dominated and controlled all negotiations on behalf of PRA Netherlands with respect to the initial agreement with DiaMedica and all amendments and modifications thereto and repeatedly advised DiaMedica that PRA Netherlands was nothing more than one of PRA USA's many laboratories or facilities.

147. At all times relevant hereto, PRA USA dictated the terms of the contracts that PRA Netherlands entered into and prevented PRA Netherlands from entering into arm's length transactions with DiaMedica.

148. PRA USA maintained unified administrative control over PRA Netherlands, as alleged *supra*.

149.    At all times relevant hereto, PRA USA abused the corporates structure of PRA Netherlands to engage in the fraudulent and deceptive conduct alleged herein.

150.    As a direct result of PRA USA's pervasive domination and control over PRA Netherlands, PRA USA and PRA Netherlands breached agreements, engaged in fraudulent and deceptive conduct, failed to perform contractual obligations, and otherwise engaged in the activity that give rise to DiaMedica's claims.

151.    Recognizing any corporate separateness as between PRA USA and PRA Netherlands would promote injustice, inequity, and fraud, and injure DiaMedica.

152.    In light of PRA USA's control over PRA Netherlands, any pretense of corporate separateness as between PRA USA and PRA Netherlands should be disregarded, and PRA USA should be held liable for DiaMedica's claims against PRA Netherlands.

## DEMAND FOR RELIEF

WHEREFORE, DiaMedica respectfully requests the following relief:

(a)    Entry of judgment in DiaMedica's favor and against Defendants as to each of the foregoing claims;

(b)    Entry of preliminary and permanent injunctions requiring Defendants to comply with the Agreement by immediately providing to DiaMedica all data, documentation, and records generated during or otherwise related to the Study;

(c)    Entry of an order piercing the corporate veil of PRA Netherlands and holding PRA USA jointly and severally liable for all damages awarded to DiaMedica;

(d)    An award of actual damages resulting from Defendants' actions and/or omissions with respect to each of the foregoing claims;

(e)      An award of punitive damages against Defendants for willfully, maliciously, and intentionally defrauding DiaMedica for the purpose of inducing it to enter into the Agreement;

(f)      Prejudgment and post-judgment interest;

(g)      Costs associated with the prosecution of this action; and

(h)      Such further relief as the Court may deem just and equitable.

DEMAND FOR JURY TRIAL

DiaMedica respectfully requests a trial by jury on all issues triable thereby.


DATED: August 24, 2018

SMITH, KATZENSTEIN & JENKINS LLP

*/s/ Kathleen M. Miller*
Neal C. Belgam (No. 2721)
Kathleen M. Miller (No. 2898)
1000 West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
nbelgam@skjlaw.com
kmiller@skjlaw.com


Alfred J. Monte, Jr., Esq. (*pro hac vice to be filed*)
FisherBroyles, LLP
One Liberty Place
1650 Market Street, 36th Floor
Philadelphia, PA 19103

Chris Pey, Esq. (*pro hac vice to be filed*)
FisherBroyles, LLP
445 Park Avenue
9th Floor
New York, NY 10022

*Attorneys for Plaintiff,*
*DiaMedica Therapeutics Inc.*